Ann Marie CROBONS, Individually and Personal Representative of the Estate of Gene J. Crobons, a/k/a Eugene J. Crobons, Deceased, Plaintiff,

v.

WISCONSIN NATIONAL LIFE INSUR-ANCE COMPANY, a foreign corporation, Marvin K. Wyant, and Brian D. Wyant, Defendants.

Civ. A. No. 83CV–6495–AA.

United States District Court,
E.D. Michigan, S.D.

Sept. 13, 1984.

Jack C. Radcliffe, Jr., Dykema, Gossett, Spencer, Goodnow & Trigg, Jackson, Mich., for plaintiff.

David G. Barnett, Barnett, Knight, Falvay & Drolet, Kenneth B. McConnell, Beier, Howlett, Hayward, McConnell, McCann, Jones, Kingsepp & Shea, Bloomfield Hills, Mich., Charles A. Nelson, Stanton, Bullen, Nelson, Moilanen, & Klaasen, P.C., Jackson, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

■ This case is before the court on the motions of defendants Wisconsin National Life Insurance Company (hereinafter referred to as Wisconsin) and Brian Wyant for summary judgment. For the reasons herein, those motions are denied. Further, because the court finds that there exists no genuine question of material fact concerning the time of death of the insured, Gene Crobons, it will enter judgment on Count I of the complaint in favor of plaintiff and against the insurance company. This ruling is in accordance with accepted practice. Once a court has made such an adverse .determination to the moving party on a motion for summary judgment brought under Rule 56, and its determination is supported by the admissible evidence presented by the party opposing the motion, summary judgment in favor of that party is appropriate even though it has not brought a cross-motion for summary judgment, *see Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir.1982); *King v. Wells*, 94 F.R.D. 675, 687 (E.D.Mich.1982).

## FACTS

The complaint discloses that Gene Crobons and Marvin Wyant were business partners. The partners allegedly entered into an oral agreement, whereby each would procure a policy of life insurance on the life of the other, with the family members of the insured as beneficiaries. One such policy was issued by defendant Wisconsin, in which Gene Crobons was the insured, Marvin Wyant the owner, and Marie T. Crobons, plaintiff herein, was the principal beneficiary. The servicing agent on the policy was Brian Wyant, son of Marvin.

On September 3, 1982, Gene Crobons was admitted to Foote Hospital in Jackson, Michigan with a diagnosis of massive subarachnoid hemmorhage. He was immediately placed on a mechanical life support apparatus. Mr. Crobons' treating physician, Dr. Rawal, has testified in deposition, without dispute, that as early as September 10, review of an electro-encephelograph indicated that plaintiff had suffered "brain death", and that he had so informed Mrs. Crobons. Dr. Rawal further testified that on September 12, he made the following entry into his progress notes:

> Blood pressure being maintained with Depamine around 70mm of mercury. No neurological change. Neuro-examination consistent with brain death.

The Certificate of Death was signed by Dr. Rawal on September 15, indicating that the time of death was 2:55 p.m. It was at that time that the artificial life support systems were turned off.

During this period, defendant Brian and Marvin Wyant were not idle. On September 15, Wisconsin received a change of beneficiary form from Jackson dated September 13, which indicated that the principal beneficiary of the life insurance policy on Gene Crobons was to be Marvin Wyant, with Mrs. Crobons to be the beneficiary of accidental death benefits. These accidental death benefits were clearly of little value at the time that the change of beneficiary form was executed, as it was then clear that Gene Crobons had not suffered an accident as defined in the policy. There is undisputed testimony by one Pat Vincent that she informed Brian Wyant on September 11 that Gene Crobons had suffered brain death, and Brian Wyant does not dispute that he knew of Gene Crobons' condition at the time that he witnessed the execution of the change of beneficiary form by his father. Brian Wyant has testified that his father signed the change of beneficiary form between 2:30 and 3:30 on the afternoon of September 13.

Several officials at Wisconsin were aware, prior to the payment of benefits to Wyant under the policy, of the nexus of events that were taking place in Jackson. John Basinger and Steven Kampmueller have both testified in deposition that they were contacted by Brian Wyant, who inquired about the proper method of changing the beneficiary under the policy. Mr. Basinger has also testified that he spoke with Brian Wyant some time prior to his conversation concerning the change of beneficiary form, at which time Brian Wyant had informed him that Gene Crobons had gone into a coma. Defendant Wisconsin subsequently conducted an investigation into the death of Gene Crobons, obtaining, among other things, a copy of the death certificate and the discharge summary, prepared by the staff at the hospital. Upon determining that the change of beneficiary form had been properly executed, Wisconsin paid the benefits of the policy to Marvin Wyant.

## DISCUSSION

The parties do not dispute the contractual rules that govern the substitution of beneficiaries under the subject insurance policy. By the express terms of the policy, the owner had an absolute rule to designate the beneficiary at any time prior to the death of the insured. Once the insured had died, however, no change in the beneficiary could be made. The instant motions call upon this court to make a determination as to whether or not Gene Crobons' death occurred before or after the change. of beneficiary form was executed by Marvin Wyant.

Initially, plaintiff contends that there is a genuine dispute concerning the time of exe-

cution of the change of beneficiary form. Plaintiff contends that the deposition testimony of Brian Wyant to the effect that the form was executed between 2:30 and 3:30 on the 13th of September is unbelievable in light of the testimony of Wayne Marx, an officer of Wisconsin. The court will assume for the purposes of this motion that the change of beneficiary form was in fact executed on the 13th of September. It concludes, nonetheless, that Gene Crobons died prior to that time, according to its construction of the Michigan Death Act, M.C.L.A. § 333.1021 *et seq.*

### Application and Construction of the Death Act

■ Plaintiff proposes, and defendants deny that the "Death Act", M.C.L.A. §§ 333.1021–.1023,[1] applies to this case.

Initially, defendants Wisconsin and Brian Wyant contend that a reading of the legislative history of the statute indicates that it was intended only to protect physicians who treat terminally ill patients from civil and criminal liability in connection with their decisions to terminate the operation of artificial life support systems. Although that portion of the legislative history identified by defendants does indeed illustrate the Legislature's concern with this problem,[2] defendants limiting interpretation of the statute must fail in light of the language of the statute, which provides in section 333.1023 in unambiguous terms, "The means of determining death in section 1 shall be used for all purposes in this state, including trials of civil and criminal cases."

The statute was drafted with just such a case as this in mind. Gene Crobons was

1. The pertinent statutory provisions read as follows:

333.1021 Death; spontaneous respiratory and circulatory functions, cessation; artificial support, spontaneous brain functions, cessation; time

Sec. 1. A person will be considered dead if in the announced opinion of a physician, based on ordinary standards of medical practice in the community, there is the irreversible cessation of spontaneous respiratory and circulatory functions. If aritifical means of support preclude a determination that these functions have ceased, a person will be considered dead if in the announced opinion of a physician, based on ordinary standards of medical practice in the community, there is the irreversible cessation of spontaneous brain functions. Death will have occurred at the time when the relevant functions ceased.

333.1022 Pronouncement before artificial support terminated

Sec. 2. Death is to be pronounced before artificial means of supporting respiratory and circulatory functions are terminated.

333.1023 Means of determining death, use

Sec. 3. The means of determining death in section 1 shall be used for all purposes in this state, including the trials of civil and criminal cases.

2. The pertinent portion of the document reads as follows:

The Apparent Problem to Which the Bill Addresses Itself:

Due to recent advances in medical technology, it is no longer a simple matter to determine when a person has died. Traditionally, the criteria for determining when a person has died have been the cessation of spontaneous (i.e., unassisted) respiratory and circulatory functions. Lately, however, it has become possible to maintain these functions artificially by means of a respirator and electrical cardiac stimulator. These devices make it possible to keep a person breathing and his/her heart beating far beyond the point at which that person's respiratory and circulatory functions would be active without assistance. In some cases, a person who is being so maintained is irreversibly comatose (i.e., there is irreversible loss of brain function) and will never again become conscious. Because of the lack of clear legal guidelines on this matter, there is some reluctance on the part of physicians to declare an irreversibly comatose person dead. That is, when a person's vital functions are being artificially maintained, there is a possibility that a physician will incur civil or criminal liabilities by withdrawing artificial support and declaring the patient dead. This reluctance can result in the indefinite maintenance of a hopelessly unconscious patient, tying up valuable and needed resources (e.g. hospital personnel, equipment, and space), and the loss of useful organs for transplantation when the patient has previously expressed a wish to donate them. Further, problems have arisen in probate and other legal proceedings where it is sometimes crucial to know the precise moment at which a person has died. In light of these problems, some persons believe that a statute should be enacted which will provide guidance in this area.

placed on artificial life support equipment immediately after his admission at Foote Hospital. His respiratory and circulatory functions were maintained only by operation of the machines. It was therefore impossible, because of this treatment, to determine if he could have sustained his respiratory and circulatory functions without aid of the equipment and if he could not, at what point those functions would have ceased. In such a situation, the treating physician is directed by the statute to determine the time of death upon the observation of the "irreversible cessation of spontaneous brain functions," which determination is to be made in accordance with "ordinary standards of medical practice in the community."

Defendants next contend that the Death Act should not be applied to determine the time of Gene Crobons' death, because such an application would amount to an improper revision of the insurance policy by the court, in violation of M.C.L.A. § 500.2226.[3]

Plaintiff counters that the terms "constitution, bylaws, rules, application or other writing", as used in section 500.2226(2) can not be construed to include the statutory law of the state, but refers only to the policies or rules of the insurer itself. Although neither party cites any authority for their alternative readings, the court concludes that defendants' position on this score is wholly unconvincing. Defendants' position, taken to its logical conclusion, is that the determination of any factual issue in a dispute involving a policy of insurance can not be resolved by a valid state law or regulation bearing on that issue unless the law has been specifically incorporated into the policy by reference. Such an interpretation of § 500.2226(2) would have the anomolous result of divesting all other state law of its effect in insurance cases. In fact, the case law consistently holds to the contrary, stating the rather obvious proposition that insurance policies are subject to

statutory regulations, and the provisions of statutes must be read into those contracts, *see, e.g. New Amsterdam Casualty Co. v. Jones*, 135 F.2d 191 (6th Cir.1943); *Chrysler Corp. v. Hardwick*, 299 Mich. 696, 1 N.W.2d 43 (1942).

Further, subsection (1) of § 500.2226 explicitly provides that:

No life insurer shall make or issue ... any contract of life insurance ... except in accordance with and under the conditions and restrictions of, the statutes now or hereafter regulating the business of life insurance.

Although the Death Act may not be part of the Michigan Insurance Code, designed specifically for regulation of the insurance industry, it is clearly addressed to a matter that is of vital concern to the operation of that industry and in particular, the administration of policies of life insurance. The court concludes, therefore, that Death Act establishes the rule for determining the time of death of Gene Crobons in this case.

The moving defendants further contend that there was no "announced opinion of a physician", nor was death "pronounced" as those terms are used by the statute, until the death certificate was signed by Dr. Rawal on September 14. Defendants argue that the time indicated on the death certificate is therefore the time of death as defined by the statute.

Although the statute provides guidance to treating physicians as to the indicia of death in cases where a person is being sustained by artificial means, and states that a person "will be considered dead" upon the announced opinion of a physician who analyzes the designated indicia, the statute does not impose upon the physicians an obligation to announce death at the earliest possible time. Rather, it merely states that, once the opinion is announced, the patient will be considered

---

**3.** That provision reads as follows:

(2) Entire contract. Every policy of life insurance hereafter issued or delivered within this state by any life insurer doing business within this state shall contain the entire contract between the parties. And nothing shall be incorporated therein by reference to any constitution, bylaws, rules, application or other writing unless the same are endorsed upon or attached to the policy when issued.

dead, although he may have died at some earlier time.

■ There is a paucity of judicial construction of the Death Act, but the court concludes that defendants have ignored the central provision of the statute. The final sentence of section 333.1021 identifies the moment of death in unambiguous terms:

Death will have occurred at the time when the relevant functions ceased.

Such a rule clearly negates defendants' argument that death did not occur until Dr. Rawal signed the death certificate. Notable by its absence from the Death Act is any mention of the time of death designated in the death certificate. Defendants contend that this designation on the public record, which is the first notification of death that will be available to any interested party, should be treated as dispositive of the question of time of death.[4] Such an argument puts the cart before the horse. The Death Act designates the time when death has occurred, and the notation on the death certificate should reflect the standard created by the Act. If the physician indicates a time of death on the death certificate which departs from the time prescribed by the statute in accordance with statutory standards (as plaintiff argues has occurred in this case) operation of the Death Act and the legal consequences that arise therefrom can not be frustrated by the conduct of the physician. Consequently, third parties such as the moving defendants, cannot take advantage of that conduct because of such a mistake.

Having identified the standard for determining the time of death, the task becomes one of application.

The dispositive issue in this case is: when did the irreversible cessation of spontaneous brain functions occur? In seeking an answer to this question, the court is directed to determine if a physician has rendered an "announced opinion" that the event has occurred. Plaintiff argues that Dr. Rawal's statement to her, and his notation in his progress notes that Gene Crobons was brain dead constitutes such an "announced opinion." Defendants contend that execution of the death certificate was the first "announced opinion" of such death, because it was the first communication that was available to the public.

■ The court concludes that both the statement of Dr. Rawal to Mrs. Crobons, and his indication in his progress notes that brain death had occurred, constituted "announced opinions" for the purposes of the Death Act. Although such an interpretation frustrates the defendants' concerns that they have notice of the death as soon as it is determined to have occurred, the court determines that the statute does not evince any intention on the part of the Legislature to provide persons in the position of the moving defendants with prompt notice. Rather, the concern of the drafters, as evinced by the legislative history cited to the court, was to provide a clear benchmark, a bright line test to be used by physicians for determining the time of death of persons who are maintained on life support apparatus.

Without attempting to construe the term "announced opinion" for all possible cases, the court concludes that Dr. Rawal gave such an announced opinion in this case. By communicating his opinion to Mrs. Crobons, or memorializing it in his notes, he enabled third persons to determine whether or not he had come to such a conclusion by means other than questioning him. In this sense, announcement of the opinion is nothing more than release of the information from the confines of the physician's own mind, thereby permitting other interested persons to discover it and act upon it. Nothing in the statute requires that the announcement take a prescribed form, or be communicated in such a way that it is

---

4. Defendants contend that the death certificate is dispositive of the issue of time of death, citing M.C.L.A. § 333.2886, which provides that a certified copy of the death certificate will be treated as "prima facie evidence of the facts stated in the original." This statute is addressed only to the evidentiary use of a certified copy in the place of the original, and says nothing about the evidentiary weight of the death certificate with respect to the issue of time of death.

equally accessible to all interested parties at the same time.

■ Further, the statute provides that once the announced opinion is given, death is conclusively inferred. However, the announcement is a sufficient but not a necessary predicate of a determination of death. The test of whether death has occurred is whether the relevant functions have ceased. Thus, a person can be determined dead if the functions have ceased, even though a physician has not yet rendered such an announced opinion. For instance, if Dr. Rawal had concluded on the 10th of September that spontaneous brain functions had irrevocably ceased, but had yet to announce this opinion to anyone, death could still be established as having occurred on that date by subsequent questioning of Dr. Rawals. The crucial time is not when the announcement was made, obviously, but when a physician, applying the statutorily designated criteria, determined that it had occurred. In this case, the evidence is uncontroverted that it had occurred sometime prior to September 12.

Although Dr. Rawal did not use the precise formulation set forth in the statute in his progress notes, it is beyond cavil that he had made the determination 'called for by the Death Act, identification of the cessation of spontaneous brain functions and had answered that fact. The fact that Dr. Rawal did not terminate the life support mechanisms until September 14, and designate that time as the moment of death, is clearly attributable to his solicitude for the reluctance of plaintiff and the other members of the family to accept the fact that Gene Crobons would not recover. Dr. Rawals' designation on the death certificate that death occurred on September 14 is contrary to all of his conduct with respect to the patient prior to that time and cannot be used to controvert the announced opinion called for by the statute to indicate death on September 10th or 12th. The death certificate does not create a genuine question of material fact.

The court need not determine the precise time of death under the Death Act in order to resolve this motion. It need only determine whether Gene Crobons died before or after the change of beneficiary form was executed. Having determined that he died some time on or before September 12, when Dr. Rawal made the announcement to Mrs. Crobons or had made the entry in his progress notes, it concludes that the crucial issue raised by these motions is no longer in dispute.

■ Defendant Wisconsin argues that it should not be precluded from reasonably relying upon the time of death set forth in the death certificate in making a determination about the proper beneficiary of the proceeds of this policy. It asserts that it could not have obtained access to Dr. Rawals progress notes, nor to his private conversations with members of the Crobons family so as to learn that there might be a dispute concerning the time of death. Regardless of whether an insurance company should be able to rely on the death certificate as a matter of standard operating procedure in the run of the mill case, Wisconsin clearly had sufficient notice of a potential dispute in this case.

Brian Wyant, who acted as the procuring agent for the policy on behalf of Wisconsin has testified that he was fully aware that Gene Crobons was in a coma, if not already dead, at the time that he witnessed his father's signature on the change of beneficiary form. Such knowledge on the part of the agent is fully attributable to the principal.

John Basinger has also testified that he was informed that Gene Crobons was in a coma some time prior to the 13th of September. He also knew that Brian and Marvin Wyant were working quickly to effect a change of beneficiary prior to the death of the insured. Under these circumstances, Wisconsin, acting as a reasonably prudent insurer, should not have accepted at face value the time of death indicated on death certificate.

Wisconsin has argued that the result that the court has reached will work an unreasonable hardship upon insurers, who

will be denied the expedient option of checking the death certificate in cases in which the time of death is disputed and allocation of proceeds hinge on the time of death. A closer investigation into the facts and circumstances of the death is not too much to ask of the company in circumstances such as this one, where the scenario of sharp dealing and possible fraud on the part of one of its agents is clearly established. When the air is rife with the odor of chicanery, it is no defense for the insurance company to argue that it held its nose and smelled nothing. In such a situation, the more prudent course for the company would be to withhold payment of benefits until greater light had been shed on the subject. Upon expiration of the period during which the proceeds from the policy had to be paid, the insurer could fully protect itself by filing an interpleader action against the rival claimants.

For the foregoing reasons, the motions are denied, and judgment will be entered for plaintiff on Count I of her complaint against defendant Wisconsin.

SO ORDERED.